# In the United States Court of Federal Claims

No. 21-1137C
(Filed Under Seal:  July 21, 2021)
Unsealed: August 30, 2021

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |
|---|---|
| **22nd CENTURY TECHNOLOGIES, INC.** | * |
| | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| **THE UNITED STATES,** | * |
| | * |
| Defendant, | * |
| and | * |
| | * |
| **ADVANCED MANAGEMENT** | * |
| **TECHNOLOGIES, INC.,** | * |
| | * |
| Defendant-Intervenor. | * |
| | * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## OPINION AND ORDER

**DAMICH, Senior Judge**

On March 30, 2021, Plaintiff 22nd Century Technologies, Inc. ("Plaintiff"), filed this post-award bid protest challenging the award of a task order to Advanced Management Technologies, Inc.  ("Defendant-Intervenor ")[1] in connection with the United States Department of Labor, Bureau of Labor Statistics, Office of Compensation and Working Conditions ( the "Agency") seeking information technology support services under Request for Quotes No. 1625-OTS-21-NAT-0005 (the "RFQ").[2]  The award provided for a five-year task order, consisting of

---

[1] Defendant-Intervenor was granted leave to intervene on March 31, 2021.  ECF No. 12.

[2] The Federal Acquisition Streamlining Act's bar on this Court hearing bid protests "in connection with the issuance or proposed issuance of a task or delivery order" does not apply, because this is a protest of a task order valued in excess of $10,000,000 for a civilian agency. *See* 41 U.S.C. § 4106(f); AR at 2 (Estimated Contract Value); Tab 16 at 322 (Box 26. Total Award Amount).

one 12-month base period and four 12-month option periods providing the best value to the Government.

The Court held a status conference on March 31, 2021 and adopted the litigation schedule provided by the parties and entered the scheduling order.  ECF No. 12.  On April 19, 2021, the United States ("Defendant") filed the Administrative Record.  ECF No. 22 ("AR").  On April 27, 2021, Defendant filed a Consent Motion to Amend/Correct the Administrative Record, ECF No. 23, which was subsequently granted.  ECF No. 24.  The Supplement to the Administrative Record was filed on April 28, 2021.  ECF No. 25.

On May 10, 2021, Plaintiff filed its Motion for Judgment on the Administrative Record ("MJAR").  ECF No. 26.  On that same date, Plaintiff filed a Consent Motion for Leave to File an Amended and Restated Complaint.  ECF No. 27.  The Court granted the Motion, ECF No. 28, and the Amend Complaint was filed on June 2, 2021.  ECF No. 31.  In its protest, Plaintiff alleges that the Agency's evaluation of the proposals and best value determination were arbitrary and irrational.  As a result, Plaintiff requests that the Court permanently enjoin the Agency from proceeding with performance under the awarded contract, require the Agency to perform a new evaluation, a new tradeoff, and make a new award decision accordance with law, and for bid and proposal costs.

The Defendant timely filed its Response in Opposition to Plaintiff's Motion for Judgment on the Administrative Record and Cross Motion for Judgment on the Administrative Record on June 1, 2021.  ECF No. 29.  Defendant-Intervenor filed its Motion for Judgment on the Administrative Record on the same date.  ECF No. 30. Thereafter briefing continued as scheduled and was completed on June 29, 2021.

After careful consideration, and for the reasons set forth below, the Court **DENIES** Plaintiff's Motion for Judgment on the Administrative Record and **GRANTS** Defendant's Cross Motion for Judgment on the Administrative Record.  The Court further **GRANTS** Defendant-Intervenor's Cross Motion for Judgment on the Administrative Record.

## I.    Facts

### A.  The RFQ

On December 3, 2020, the Agency issued the RFQ for a contractor to provide application development support services for development and implementation of data capture, data review, and estimation systems.  AR at 1, 309.  The Agency had an existing information technology application-development Blanket Purchase Agreements ("BPA") issued by the General Services Administration ("GSA") under the GSA Schedules Program, and therefore, the Agency determined the task order could fall within the BPA allowing the  RFQ to be competed among the six BPA holders.  AR at 309.  The RFQ was for a five-year task order, consisting of a one 12-month base period and four 12-month option periods.  AR at 7.

The procurement was conducted under Federal Acquisition Regulation ("FAR") Subpart 8.4. AR at 10.  In particular, the procurement stated:

Note: This is a FAR Part 8 procurement. FAR Part 15 procedures do not apply to evaluation of Schedule BPA quotations and will not be used. A Contractor may be eliminated from consideration for a task order without further exchanges if its technical and/or pricing quotes are not among those contractors considered most advantageous to the Government based on a best value determination.

*Id.*

Offerors were instructed that "[e]ach quote shall clearly demonstrate that the Contractor understands both the general and specific technical requirements of the PWS [performance work statement]." AR 8. Offerors were further instructed that "[f]ailure to explain Contractor's ability to meet all requirements may result in the Contractor's quote not being considered. Clarity and completeness of quotes are of the utmost importance; therefore, quotes must be written in a practical, clear, and concise manner." *Id.*

The Agency would evaluate the proposals using the following two factors for award: (1) Technical Capability, and (2) Price. AR at 9-10.  With respect to Technical Capability, each contractor's response was to address three components: (i) Technical Approach; (ii) Phase-In Plan; and (iii) Management Plan. *Id.* Specifically, the contractor's proposal had to had to contain the following:

**Technical Approach**
The Government will evaluate the Contractor's Technical Approach for the following:
> 1) The approach has enough detail to provide the Government with confidence that the Contractor can successfully perform the work described in the PWS.

**Phase-In Plan**
The Government will evaluate the draft Phase-In Plan for the following:
> 1) The plan has enough details to provide the Government with confidence that the Contractor will ensure minimal disruption with operations, meet the requirements outlined in the BPA for Phase-In, and provide a qualified transition team; and

> 2) The schedule and milestones are provided in enough detail to provide the Government with confidence that the Contractor will be successful.

**Management Plan**
The Government will evaluate the Management Plan for the following:
> 1) The Management Plan aligns with the Contractor's proposed technical approach in enough detail that the Government has confidence that the Contractor will successfully meet the requirements of the task order;

> 2) The Management Plan includes plans for hiring, retaining, and training staff with enough detail that the Government has confidence the Contractor will be successful in staffing to the level needed to successfully complete the task order requirements outlined in [Performance Work Statement].

3) The Key Personnel positions and candidates proposed have the required qualifications and provide the Government with confidence that the task order will be successfully managed.

AR at 11.

The technical capability would then be evaluated using the following evaluation ratings:

**For Factor 1 – Technical Capability:**

| High Confidence | The Government has **high confidence** that the Contractor will be successful in performing the task order with **little or no** Government intervention. |
| --- | --- |
| Some Confidence | The Government has **some confidence** that the Contractor will be successful in performing the task order with **some** Government intervention. |
| Low Confidence | The Government has **low confidence** that the Contractor will be successful in performing the task order **even with** Government intervention. |

AR at 12.

For Factor 2, the Agency would evaluate Price as follows:

Under this evaluation factor, the Government will evaluate price over the entire task order period of performance, including all option years. The Government will evaluate price for the following:

a) Completeness and accuracy.
b) One FTE equates to 1,920 hours.
c) Labor categories and hour-mix are consistent with the technical quote.
d) Labor categories are on the BPA and that the rates submitted are equal to or less than the agreement rates.

Additionally, the Government may ask for additional information to support the Contracting Officer's determination of price reasonableness.

*Id.*

Technical Capability was more important than price.  AR at 11.  Therefore, the Agency advised that it would complete an evaluation of Factor 1, Technical Capability, and then it would compare Factor 2, Price, against those ratings to determine the combination most advantageous to the Government.  *Id.*  An offeror could be eliminated from consideration if its technical and/or pricing quotes were not among those contractors considered most advantageous to the Government based on a best value determination.  AR at 10.

### B.  The Agency's Technical Evaluations as Provided in the RFQ

The Agency received proposals from Plaintiff and Defendant-Intervenor, as well as the other four BPA holders.  AR at 153, AR at 309.  A technical evaluation panel ("TEP") was formed to evaluate the technical aspects of the proposals.

### 1.  Plaintiff's Technical Evaluation Reports

On February 10, 2021, the TEP issued an initial evaluation report for Plaintiff's technical proposal.  The TEP rated Plaintiff's technical proposal as having a "low" confidence rating.  AR at 284-287.  The report identified one aspect of Plaintiff's  proposal that "raised" expectations of success and three aspects of its proposal that "lowered" expectations of success.  AR at 284.  The report also identified 10 other issues in Plaintiff's technical proposal that needed clarification. AR 285-86. The TEP explained its overall "low" confidence rating stating:

> The Government has **low confidence** that the Contractor will be successful in performing the task order **even with** Government intervention.
>
> The underestimation of hours for Task 7, the lack of sufficient detail for 508 compliance testing, the lack of sufficient detail for a Phase-In approach, and the Lead Architect's lack of experience in primary web application software including Java and Angular is a significant risk to successful contract performance across multiple critical tasks.

AR at 286 (bold and italics in original).

On February 24, 2021, the Agency informed Plaintiff that it was unlikely to be a viable competitor for the acquisition, AR at 291, and that it would not include Plaintiff in the proposal clarifying questions and answers process based on the TEP's evaluation.  *Id*.  The Agency further stated:

> The intent of this notice is to minimize proposal development costs for Offerors with little or no chance of receiving an award and assist you in your timely decision-making. However, if you wish to participate in the proposal clarification process notwithstanding the advice in this notice[,] [p]lease provide responses to your clarifying questions by 3:00 PM EST, February 25, 2021. All revised proposals must be received by 3:00 PM EST, February 26, 2021 to be considered for further evaluation and award.

AR at 292. The notice identified six clarifying items.[3] AR at 293.

---

[3] All the offerors, regardless of the initial rating were provided clarifying questions and allowed to respond.  AR at 310. Of the six vendors, four were advised to continue with submitting a revised proposal and response to clarifying questions and two were advised that they should continue with submitting a revised proposal but unlikely to be awarded the contract

Thereafter, on February 25, 2021, Plaintiff submitted a revised proposal and responses to the Agency's clarifying questions.  AR 296-99.  The Agency then re-evaluated the proposal.  In its re-revaluation, the TEP did not identify any factors that either raised or lowered expectations of success.  AR at 304.  However, after re-evaluation, the TEP increased its overall rating of Plaintiff's proposal to a rating of "some" confidence explaining:

> The Offeror's quote adequately addressed all the Government's needs as outlined in the RFQ.  No elements addressed within the proposal raised or lowered the expectation of success, thus the overall rating is "Some Confidence."

AR at 304-305.

### 2. Defendant-Intervenor's Technical Evaluation Reports

Unlike Plaintiff's proposal, the TEP issued its initial evaluation of Defendant-Intervenor's technical proposal as having a "high" confidence rating.  AR at 288-290.  In particular, the report identified five aspects of Defendant-Intervenor's proposal that "raised" expectations of success and one aspect of Defendant-Intervenor's proposal that "lowered" expectations of success.  *Id.* The report also identified one other issue in Defendant-Intervenor's technical proposal that needed clarification.

In its explanation of its overall "high" confidence rating of Defendant-Intervenor's technical proposal, the TEP stated:

> The Government has ***high confidence*** that the Contractor will be successful in performing the task order ***with little or no*** Government intervention.
>
> The Offeror's technical approach would be an advantage to successful contract performance across multiple critical tasks. The Offeror's proposed technical approach was highly detailed and included examples of previous projects where the approach was successfully implemented. However, the underestimation of hours for the XXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.

AR at 289 (bold and italics in original).

The Agency then told Defendant-Intervenor that it was likely to be a viable competitor for the acquisition and that it should participate in the proposal clarifying questions and answers process.  AR at 294.  The Agency had two clarifying questions.  AR at 295.  Defendant-Intervenor submitted answers to the questions.  AR at 300-03.

---

due to their Technical Capability submission. *Id*.  Plaintiff was one of the two advised that it was unlikely to be awarded the contract.

After re-evaluating Defendant-Intervenor's revised technical proposal and responses to the clarifying questions, the TEP's rating of Defendant-Intervenor's proposal remained a "high" confidence that it could successfully perform the task order with little or no Government intervention.  AR at 306-308.  In support, the final report identified five factors that raised expectations of success. AR at 306.  In particular to the case at hand, under Factor 1: Technical Capability, the TEP found that:

> The Offeror described their technical approach in extreme attention to detail. The Offeror's approach includes micro services which is an innovative architecture strategy. XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXX raises the expectation of successful contract performance on this significant project. (References: Quote – Page 3; RFQ – Page 3, Technical Approach, PWS – Page 109, Section 14)

*Id.*  The TEP then explained its overall "high confidence" rating:

> [Defendant-Intervenor's] technical approach would be an advantage to successful contract performance across multiple critical tasks. [Defendant-Intervenor's] proposed technical approach was highly detailed and included examples of previous projects where the approach was successfully implemented, thus the overall rating is "High Confidence."

AR at 307-308.

### C.  Price Evaluation by the Agency

In accordance with the RFQ Factor 2, the Agency conducted a price analysis of the six proposals received to determine the fairness and reasonableness of the prices submitted.  AR at 315-16.  The Agency analyzed two aspects of the offerors' price quotes: (1) a price comparison with the Independent Government Cost Estimate (IGCE)[4]; and (2) a price comparison among the offerors' themselves.  *Id.* at 316-317.  The RFQ also "requested discounted rates from previously submitted BPA prices." AR at 311.  Based on this analysis, the Agency identified three offerors – Plaintiff, Defendant-Intervenor, and one other – whose price quotes were below the IGCE.  *Id.*

The Agency then did a price comparison among all six offerors, comparing the percentage between each offeror's total-evaluated price and the percentage spread between the lowest-priced offeror and the highest-priced offeror.  The Plaintiff's proposal was the lowest in price.  Defendant-Intervenor was third lowest in price. *Id*.  However, Defendant-Intervenor also XXXXXXXXXXXXXXXXXXXXXX, which would result in a cost savings of  XXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.  *Id*.  Plaintiff did not offer such. Thereafter, the Agency deemed that all six vendors' price quotes were fair and reasonable.  *Id*.

---

[4] "The IGCE is based on average labor category rated calculated from the awarded price schedules of the six BPA holders."  AR at 312.

The contracting officer and contract specialist conducted a best-value trade-off analysis and made a best-value award recommendation based on the two factors: (1) technical capability, and (2) price, noting that technical capability was the more important factor.  AR at 310-12.  The contracting officer and contract specialist evaluated the TEP reports for each offeror and concluded that three offerors' technical proposals were rated "High Confidence."  AR at 312.  They included: (1) Defendant-Intervenor, (2) BAE Systems Technology Solutions & Services, Inc., and (3) Soft Tech Consulting Inc.  AR at 310-11.  Relying on the TEP reports, the contracting officer and contract specialist concluded that the other three offerors, including Plaintiff, provided the Government with "some" level of confidence, but that those offerors did not provide enough detail in their proposals to warrant "high" confidence ratings.  AR at 311.

After performing the price analysis, the contracting officer and contract specialist found that Defendant-Intervenor's proposal represented the largest cost savings to the Government among the three most highly-rated technical proposals. AR at 312, 318.

Accordingly, after considering both the technical and price factors, with the technical factor being most important, the contracting officer and contract specialist determined that Defendant-Intervenor's quotation was in the best interest of the Government and provided the best value.  AR at 312, 319.

On March 24, 2021, and after re-evaluation of the proposal, the TEP informed Plaintiff that its submission was unsuccessful. AR at 319.  On that same date, Plaintiff requested a debriefing and was advised by the Agency that no additional information was required as the Agency's letter complied with FAR 8.405-2(d).  AR at 320.

On March 30, 2021, Plaintiff filed its complaint in this Court and on June 2, 2021, Plaintiff filed its Amended and Restated Complaint.

## II.     Standard of Review

### A.  Standard for Motion for Judgment on The Administrative Record

This Court decides a motion for judgment upon the administrative record pursuant to RCFC 52.1.  The Court determines whether "given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record."  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356-57 (Fed. Cir. 2005).  "[T]he judgment on an administrative record is properly understood as intending to provide for an expedited trial on the record."  *Id*. at 1356.

### B.  Bid Protest Standard of Review

In a bid protest, the trial court "review[s] the agency's decision pursuant to the standards set forth in section 706 of Title 5," the Administrative Procedure Act ("APA").  28 U.S.C. § 1491(b)(4); *see Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  In reviewing the agency's procurement decisions, the Court does not substitute its judgment for that of the agency. *Redland Genstar, Inc. v. United States*, 39 Fed. Cl. 220 (1997);

*Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 663, 672 (1997); *see also M.W. Kellogg Co. v. United States*, 10 Cl. Ct. 17, 23 (1986) (holding that "deference must be afforded to an agency's . . . procurement decisions if they have a rational basis and do not violate applicable law or regulations."). The disappointed bidder "bears a heavy burden," and the contracting officer is "entitled to exercise discretion upon a broad range of issues confronting [her]." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citations and quotes omitted). This burden "is not met by reliance on [the] pleadings alone, or by conclusory allegations and generalities." *Bromley Contracting Co. v. United States*, 15 Cl. Ct. 100, 105 (1988); *see also Campbell v. United States*, 2 Cl. Ct. 247, 249 (1983). A procurement decision is rational if "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Impresa*, 238 F.3d at 1333. But "that explanation need not be extensive." *Bannum, Inc. v. United States*, 91 Fed. Cl. 160, 172 (2009) (*citing Camp v. Pitts*, 411 U.S. 138, 142-43 (1973)).

The Court's "highly deferential" review such that "the disappointed offeror bears a 'heavy burden' of showing that the award decision 'had no rational basis' is particularly the case with respect to matters requiring technical judgment. *See, e.g., Benchmade Knife Co., Inc. v. United States*, 79 Fed. Cl. 731, 740 (2007) ("Agencies are entitled to considerable discretion and deference in matters requiring exercise of technical judgment."); *Beta Analytics Int'l, Inc. v. United States*, 67 Fed. Cl. 384, 395 (2005) ("the minutiae of the procurement process . . . involve discretionary determinations of procurement officials that a court will not second guess.") (quoting *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996)). The protester's mere disagreement with the agency's assessment is not "nearly enough" to demonstrate arbitrary and capricious agency action. *See CRAssociates, Inc. v. United States*, 102 Fed. Cl. 698, 717-18 (2012).

Similarly, in the case of FAR Subpart 8.4 procurements have few applicable procedures because such procurements are meant to be simple and flexible and, importantly, that agencies need only provide a rational and reasonable basis for award decisions. *Holloway & Co., PLLC v. United States*, 87 Fed. Cl. 381, 393-394 (2009) ("[C]onsistent with the simplified and flexible approach Part 8 takes toward [FSS] procurements, . . . the protester will not be able to prevail on the theory that the procurement procedure involved a clear and prejudicial violation of applicable statutes and regulations, because no applicable procedural regulations are contained in [FAR] Part 8**.** A protester instead must rely on establishing that the government officials involved in the procurement process were without a rational and reasonable basis for their decision.").

And finally, where, as here, the contract award is based upon the "best value," the agency has even greater discretion than if the contract were awarded upon the basis of cost alone. *Galen Medical Assoc., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004); *E.W. Bliss Co.*, v. *United States*, 77 F.3d 445, 449 (Fed. Cir. 1996). "[P]rocurement officials have substantial discretion to determine which proposal represents the best value for the government." *Id.* at 449 (citation omitted). A best-value determination should not be disturbed so long as the agency "documents its final award decision and includes the rationale for any business judgments and tradeoffs made." *Blackwater Lodge & Training Center, Inc. v. United States*, 86 Fed. Cl. 488, 514 (2009). Moreover, "[a]n agency's contract award is thus least vulnerable to challenge when

based upon a best value determination." *Planetspace, Inc. v. United States*, 96 Fed. Cl. 119, 125 (2010) (citing *Galen*, 369 F.3d at 1330).

## III.   Discussion

In its three-count Amended Complaint, filed to conform with its MJAR, Plaintiff alleges the following: Count I: The Agency's technical factor evaluation was arbitrary, capricious; Count II: The Agency evaluated proposals unequally; and Count III: The Agency's award decision was irrational, arbitrary, capricious, and not in accordance with law.  With regard to the Agency's evaluation of Plaintiff's technical evaluation, Plaintiff argues that the Agency disparately evaluated its proposal as compared to Defendant-Intervenor's proposal in three respects: (1) treatment of "micro services;"(2) treatment of development and security, and operations (DevSecOps); and (3) treatment of "new tools."  *See* ECF No. 31 at 7-9; ECF No. 26 at 8-13.  With regard to its best-value  analysis, Plaintiff argues that the Agency: (1) failed to trade off against price; (2) the Agency prioritized proposals rated with "high confidence over those rated as "some confidence;" and (3) Plaintiff disagrees with the  TEP's evaluations.  For the reasons set forth below, the Court is not persuaded by any of Plaintiff's arguments.

### A.  The Agency's Decision was Rational in its Technical Evaluation

In order to prevail on a disparate treatment claim a protestor must show either "that the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals" or that "the agency inconsistently applied objective solicitation requirements between it and other offerors, such as proposal page limits, formatting requirements, or submission deadlines." *Office Design Group v. United States* 951 F.3d 1366, 1372 (Fed. Cir. 2020).  Only if a protester meets one of these thresholds can the reviewing court "comparatively and appropriately analyze the agency's treatment of proposals without interfering with the agency's broad discretion in these matters." *Id*. at 1373.

Furthermore, the evaluation of proposals for their technical excellence or quality is a process that often requires the special expertise of procurement officials.  Thus, reviewing courts give the greatest deference possible to these determinations.  *See E.W. Bliss Co.,*77 F.3d 445, 449 (Fed. Cir. 1996).  As the Federal Circuit has stated, challenges concerning "the minutiae of the procurement process in such matters as technical ratings . . .  involve discretionary determinations of procurement officials that a court will not second guess."  *Id*. at 449; *see also Banknote Corp. of Am. v. United States,* 56 Fed. Cl. at 384 (determining that "naked claims" of disagreement with evaluations "no matter how vigorous, fall far short of meeting the heavy burden of demonstrating that the findings in question were the product of an irrational process and hence were arbitrary and capricious").

1. **The Agency Rationally Evaluated the Offerors with regard to "Micro Services"[5]**

Plaintiff argues that the Agency did not properly evaluate the offerors' technical proposals because Plaintiff's proposal mentions "micro services" three times and contained a diagram whereas Defendant-Intervenor's proposal only mentions "micro services" once. Yet, even with only one mention of "micro services" Defendant-Intervenor was rated a strength under its proposal for "micro services" and Plaintiff was not.[6]   Simply put,  it is Plaintiff's contention that the Agency should use a quantitative approach to technical evaluations, rather than a qualitative one.  The Court disagrees.

The record shows that indeed Plaintiff mentions "micro services" three times in its technical proposal as compared to Defendant-Intervenor's one- time usage of "micro services." Plaintiff also provided what appears to be a detailed chart as to how it would intergrate the micro services. AR at 539.  Accordingly, Plaintiff argues that it should have been awarded as "strength."  However, it is not the job of the Court to second guess the Agency's decision but instead to review the record to make sure the Agency's decision is rational.

The record indicates the reason why the Agency raised the Defendant-Intervenor's expectation of success rating:

> The Offeror described their technical approach in extreme attention to detail. The Offeror's approach includes micro services which is an innovative architecture strategy. XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXX raises the expectation of successful contract performance on this significant project. (References: Quote – Page 3; RFQ – Page 3, Technical Approach, PWS – Page 109, Section 14)

---

[5] Microservices - also known as the microservice architecture - is an architectural style that structures an application as a collection of services that are

- Highly maintainable and testable
- Loosely coupled
- Independently deployable
- Organized around business capabilities
- Owned by a small team

The microservice architecture enables the rapid, frequent and reliable delivery of large, complex applications. It also enables an organization to evolve its technology stack.  Chris Richardson, https://microservices.io (last visited July 21, 2021).

[6] Although Plaintiff refers to ratings as "strengths" or "weaknesses," the RFQ did not assign "strengths" or "weaknesses" but instead indicated elements of a quote that "raised[d] or lower[ed] expectations of success."  AR at 284.

11

The TEP was seemingly impressed by the detailed technical approach taken by Defendant-Intervenor as a whole and that the technical approach was not limited to "micro services" architecture alone. *See also* AR at 615-618.  The TEP noted that Defendant-Intervenor had a comprehensive description of its technical approach in its proposal, and the attention to detail raised the Government's confidence in Defendant-Intervenor's ability to successfully perform the task order.  Thus, the record shows that the TEP reviewed the technical proposal thoroughly.

In contrast, when the TEP evaluated Plaintiff's proposal, even though the proposal mentioned "micro services" three times, the TEP did not find that the Plaintiff's description of its technical approach either raised or lowered the Government's confidence.  AR at 304.  Nevertheless, Plaintiff refers this Court to its actual proposal, AR at 539, for the Court to review and analyze how Plaintiff planned to use "micro services" "in great detail."  ECF No. 26 at 10.  However, "micro services" involves a subjective judgment that is for the Agency to make.  The Agency has supported its decision in a detailed analysis. Therefore, the Court will not second-guess the Agency's decision with regard to its application of the "micro services" especially in light of the fact that it relates to a technical rating.  *See E.W. Bliss Co.,* 77 F.3d at 449.  As such, the Agency's decision was not arbitrary and capricious, or contrary to law.

### 2.   The Agency Rationally Evaluated the Offerors' Approaches to "DevSecOps."

Plaintiff argues that the Agency treated it unequally in its evaluation of DevSecOps.  Specifically, Plaintiff argues that because it addressed DevSecOps in its technical proposal as did Defendant-Intervenor, Plaintiff should have been rated the same as Defendant-Intervenor under this section.  ECF No. 26 at 10-11.  In support, Plaintiff includes its side-by-side accounting of the three DevSecOps references from its own proposal next to two Defendant-Intervenor proposal references.  *Id*.  Plaintiff concludes that this shows that "[t]here is no substantive difference between the quotations."  *Id*.

The TEP found that Defendant-Intervenor's:

> approach on incorporating [DevSecOps] into the task order XXXXX XXXXXXXXXXXXXXX, will result in immediate problem notification and remediation, thus creating faster, error-free products and raising the expectation of successful contract performance.(citing pages 10-11 of Defendant-Intervenor's proposal.).

AR at 306.  However, according to the Plaintiff, pages 10-11 of Defendant-Intervenor's proposal merely states:

> [Defendant-Intervenor] has deep expertise in DevSecOps, a continuous integration pipeline which integrates building and integrating code; performing unit, integration, functional and security testing; and deploying into hosting environments.

ECF No. 32 at 6; AR at 623.  This statement alone, should not have allowed the Agency to deem it a "strength."  ECF No. 32 at 6.

Defendant, however, cites to other pages within the record that indicate that the Agency relied on other sections as well as a basis for the Agency to award the higher rating with regard to Defendant-Intervenor's DevSecOp proposal.  *See, eg.* AR 622-23.  According to Plaintiff, however, there is absolutely nothing in the record to support that the TEP relied on other sections of the proposal for the TEP's conclusion, and, therefore, the Court must disregard that argument because of *post hoc* rationalizations in bid protests are disfavored.  ECF No. 32 at 6.

Although Plaintiff is correct that *post hoc* rationalizations in bid protests are disfavored, Plaintiff fails to appreciate that this procurement is a  FAR Subpart 8.4, not FAR Part 15, procurement for which the Agency is neither expected nor required to document every decision it makes in rigorous detail.  *Matt Martin Real Est. Mgmt. LLC v. United States*, 96 Fed. Cl. 106, 116-117 (2010) ("The amount of documentation necessary in FAR Subpart 8.4 procurements does not rise to the level required by FAR Part 15.).  Furthermore, as this is a FAR part 8.4 procurement the Agency procurements have few applicable procedures because such procurements are meant to be simple and flexible and, importantly, that agencies need only provide a rational and reasonable basis for award decisions.  *Holloway & Co., PLLC v. United States*, 87 Fed. Cl. 381, 393-394 (2009) ("[C]onsistent with the simplified and flexible approach Part 8 takes toward [FSS] procurements, . . . the protester will not be able to prevail on the theory that the procurement procedure involved a clear and prejudicial violation of applicable statutes and regulations, because no applicable procedural regulations are contained in [FAR] Part 8**.** A protester instead must rely on establishing that the government officials involved in the procurement process were without a rational and reasonable basis for their decision.").  In addition, consistent with the Court's substantial evidence inquiry, the Court is required to review the contemporaneous administrative record that was considered by the Agency.

Since the contemporaneous evaluation record shows that the agency evaluated the proposals as a whole, it is hard to believe that the TEP limited its entire analysis to those two pages of the Defendant-Intervenor's proposal. It is more believable that the TEP report cited pages 10-11 of that proposal as an example.  Additionally, under a FAR Subpart 8.4 procurement, an Agency is not required to write down all its proposal citations, although to prevent future protests it may wish to.

Again, the Court will not second guess the Agency's decision where there is support in the record to uphold its decision.  Here, the TEP did its job—it evaluated how each offeror addressed each factor substantively.  Thus, the Agency did not improperly treat Plaintiff's and Defendant-Intervenor's quotes disparately.  Furthermore, the Court will not second-guess the Agency's decision with regard as it relates to a technical rating*.  See E.W. Bliss Co.,*77 F.3d at 449.  As such, the Agency's decision with regard to DevSecOps was rational.

3. **The Agency was Rational in its Evaluation of the Offerors' Approaches to "New Tools"**

Plaintiff asserts that the Agency unequally treated its proposal in its evaluation with respect to "new tools."

The record shows that the TEP concluded that Defendant-Intervenor's "approach to proposing new tools such as Redmine XXXXXXXXXX and JMeter XXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXX raises the Government's expectation of success." AR at 306-307. The TEP further found that Defendant-Intervenor's "incorporation of these tools into XXX XXXXXXXXXXXXXXXXXXXXXXXXXX will improve accountability and efficiency." *Id.*

In support of its evaluation, the TEP identified Redmine and JMeter as two examples of tools that Defendant-Intervenor's proposal discussed. AR at 306-307. However, as it turns out, Redmine itself is not a new tool. Defendant-Intervenor did not indicate that is was, instead its proposal acknowledged that: "current tools consist of XXXX, Redmine and XXXXXXX." AR at 620. With this old tool, Defendant-Intervenor proposed standardizing Redmine for XXXXXX XXXXXXXXXXXXXXXX. AR at 623.

Plaintiff took a different approach. In this section of its bid, Plaintiff relied primarily on lists and diagrams. *See, e.g.*, AR at 537-38. As stated in the RFQ, the quotes were to be assessed on the details to demonstrate how its approach would utilize the tools and solutions to successfully perform the work. AR at 8, 11, and 12. And after evaluation, the TEP did not find that the description had either raised or lowered the Government's confidence. Once more, this argument is one of mere disagreement with the TEP's evaluation. Plaintiff has not shown that the evaluation was unreasonable or irrational.

Even though the TEP report mischaracterized Redmine as a "new tool" when it was an existing tool that Defendant-Intervenor was proposing to use XXXXXXXXXXX, Plaintiff must show that that mischaracterization resulted in significant, prejudicial errors. *See Prescient, Inc. v. United States*, 125 Fed. Cl. 475, 485 (2016) (finding that agency's disparate evaluation did not result in prejudice to protester); *Glenn Defense Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901 (2013) ("*De minimis* errors in the procurement process do not justify relief. The protester bears the burden of proving that a significant error marred the procurement question.") (citations omitted). Plaintiff cannot do so. The TEP found that the integration of RedMine and XXXXXXXXXXXXXXXXX contributed to its conclusion that the tools expansion raised the Agency's expectation of success.

Therefore, the Agency did not improperly treat Plaintiff's and Defendant-Intervenor's quotes disparately. Furthermore, the Court will not second-guess the Agency's decision with regard as it relates to a technical rating. *See E.W. Bliss Co.,* 77 F.3d at 449. As such, the Agency's decision with regard to "new tools" was rational.[7]

---

[7] Plaintiff again raises the issue of *post hoc* rationalizations. Again, as this is a FAR part 8.4 procurement which are meant to be simple and flexible and, importantly, that agencies need only provide a rational and reasonable basis for award decisions, which it has done.

**B. The Agency did not act Arbitrarily when it removed a "Strength"**

In its original technical evaluation, the TEP flagged three areas of concern in Plaintiff's initial proposal, which the Agency concluded "lower[ed] expectation of success." AR at 284-285.  The TEP also, however, noted one area that "raise[d] expectation of success":

> The Offeror provided a detailed technical approach relating to iterative software development methodologies that would be utilized. The Offeror outlined a practical Agile strategy that included a SaFe [] approach which raises the Government's confidence. The Offeror's approach demonstrates that they have the capability to manage large multi-team development that will be critical to the successful completion of the New Data Collection System and SOII Integration projects.

*Id*. at AR 284.

Thus, the TEP was impressed with Plaintiff's proposal with regard to three factors: the detailed technical approach to iterative software development, the practical Agile strategy, and the proposed SaFe approach.

In its re-evaluation, however, the TEP did not rate this area as "raise[d] expectation of success" and Plaintiff now complains that "the Agency removed a strength without any explanation." ECF No. 26 at 13.  Plaintiff further adds that it made no changes to the SaFe Process (Scaled Agile Framework) portion of Section 1.1.3.  *Id*. (emphasis in the original). Because it did not make any changes to this section, and the Agency removed the strength without explanation, Plaintiff argues that the Agency acted arbitrarily. *Id*.

However, although Plaintiff did not make any changes to its SaFe Process portion of its proposal, Plaintiff did in fact make other changes to Section 1.1.3 when it resubmitted a redlined version of its original proposal.  AR 534-603.  In fact, Plaintiff removed much of the proposal related to its iterative software approach as well as its Agile strategy, two of three areas previously found favorable by the TEP.  It is probable that this revision changed the TEP's assessment under Section 1.1.3.  Nothing in the RFQ or FAR mandate that such a re-evaluation may only result in favorable evaluation changes.  Plaintiff's mere disagreement with the technical determinations is insufficient to support its claim that the Agency acted irrationally.[8]

**C. The Agency's Best Value Determination was Rational**

Agencies enjoy broad discretion when conducting best value determinations.  *See, e.g., Banknote Corp.*, 365 F.3d at 1355 (observing that "[i]t is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly, when, as

---

[8] The Court notes that with even the TEP downgrading this "strength" the TEP raised Plaintiff's score from "low confidence" to "some confidence."

here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value."); *E.W. Bliss Co.*, 77 F.3d at 449 (observing that "[p]rocurement officials have substantial discretion to determine which proposal represents the best value for the government.").

At the heart of Plaintiff's argument, is its argument that the Agency's best value determination was arbitrary and irrational because the Agency failed to conduct the required price tradeoff, improperly treated ratings of "Some Confidence" as unawardable, and allowed it misevaluation of technical quotes to "infect" the ultimate award decision.  ECF No. 26 at 15-17.

First, Plaintiff's argument that the Agency lacked a rational basis in its technical evaluation must fail based on the Court's opinion above.  Second, the Agency did not arbitrarily treat "Some Confidence" ratings as unawardable or fail to conduct the required price tradeoff. Rather, the record is clear that the Agency did exactly what it stated it would do in the RFQ.

 The RFQ stated that technical capability was more important than price and that the agency's objective was to select the quote that offered the best value to the Government, not necessarily the lowest price. AR at 11. The RFQ further stated that an offeror could be eliminated from consideration without further exchange if its technical and/or pricing quotes were not among those considered most advantageous to the Government based on a best value determination.  AR at 10.  In addition, the RFQ stated that after the agency evaluated each offeror's technical capability, the price to the Government would be compared against the rating to determine the best value to the Government.  AR at 11.

The record shows that, consistent with the RFQ, the Agency conducted technical evaluations of each offeror and concluded that three of the offerors submitted technically superior proposals, each rated "high confidence."  AR at 310-311.  The Agency further determined that these three quotes were more advantageous to the Government than the lower-rated quotes. AR at 311 ("As a result of having (3) vendors equally rated as "High Confidence" for Factor 1, Technical Capability, pricing became the determining factor.").  Thus, the contracting officer, exercising his discretion, and consistent with the RFQ, determined that the three technically superior proposals were more advantageous to the Government.

However, the Agency still conducted a price analysis of all six proposals, consistent with the RFQ.  AR at 311-12.  The Agency compared all quotes against the IGCE, ranked vendors in order of price, and noted each vendor's percentage deviation from both the IGCE and the next highest- and lowest-ranked vendor.  *Id*.

The agency also ranked all six offerors in order of price, listing them in order from the lowest-priced proposal to the highest-priced proposal. AR at 317.  In doing so, the agency noted the percentage difference between each successive offeror and then identified the total difference between the lowest priced proposal and the highest.  *Id.*

Plaintiff alleges that the price evaluation was deficient because "[t]he moving price target the Agency used, comparing one company's price only against the next highest price, but never the others, was irrational," and "[a]t no point did the authority make an apples-to-apples

comparison between bidders." ECF No. 26 at 16. Nowhere in the RFQ does it state that each offeror would be evaluated against every other price. Nor did the RFQ require that the Agency had an obligation to do so. In fact, the RFQ provided only that "[a]fter an evaluation of Technical Capability has been completed and ratings have been established, the Price to the Government will be compared against these ratings to determine the combination most advantageous to the Government." AR at 86. This is precisely the process followed by the Agency: it first evaluated the Technical Capability and assigned ratings to each vendor's quote, and then compared the ratings against price.

Thereafter, after the Agency completed all of its evaluations, the Agency determined that Defendant-Intervenor provided the best value to the Government. AR at 312, 318. In support, the contracting officer wrote:

> **Award Decision**: As a result of this evaluation, there were (3) Vendor's that were rated "High Confidence" for Factor 1 – Technical Capability. In this circumstance, price became the determining factor because the rating of the non-price factor became equal between the vendors. Based on the above, the Government has determined that [Defendant-Intervenor] provided the best value to the government. . . . A comparison of [Defendant-Intervenor's] overall price indicates a savings of **$1,523,695.36 or 7.4%** below the IGCE to the Government.

AR at 312 (emphasis in the original).

The record demonstrates that the Agency properly evaluated both proposals against the evaluation criteria set forth in the RFQ and documented a reasonable rationale for its best-value tradeoff decision. Therefore, the Court holds that the Agency's determination that Defendant-Intervenor's proposal was the best value to the Government was reasonable, in compliance with the RFQ's evaluation criteria, and otherwise in accordance with law.

## IV.    Conclusion

For the reasons set forth above, the Court **DENIES** Plaintiff's Motion for Judgment on the Administrative Record. The Court further **GRANTS** Defendant's and Defendant-Intervenor's Cross Motion for Judgment on the Administrative Record. In light of this Opinion and Order the Court **DENIES** Plaintiff's request for injunctive and declaratory relief. The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

Edward J. Damich
EDWARD J. DAMICH
Senior Judge
